**Slip Op. 03-46**

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
                                 :

ESSEX MANUFACTURING, INC.,

                                 :

                   *Plaintiff,*

                                 :

          v.                       Court No. 01-00024

                                 :

UNITED STATES,

                                 :

                 *Defendant.*

———————————————————————:

[Plaintiff's motion for summary judgment denied, and Defendant's cross-motion granted.]

Decided: April 29, 2003

Neville Peterson LLP (John M. Peterson and Maria E. Celis), for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General; John J. Mahon, Acting Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jack S. Rockafellow); Sheryl A. French, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

This action challenging a Notice to Redeliver merchandise is the final chapter in a saga that highlights the risks and dangers that attend the many opportunities inherent in doing business in today's global economy. It is a saga of (in the words of Defendant) "an importation gone wrong," in which (in the words of Plaintiff) "a secret, and still mysterious, documentation arrangement"

between customs officials at home and abroad plays a central role; a saga set against a backdrop of international intrigue and events a half world away, revolving around a transaction tainted with the whiff of double-dealing, fraud, forgery and corruption, and yet spiced with exposure to the unique customs and traditions of another culture – in this case, the acclaimed hospitality of Mongolia, where guests are entertained with yak hunting and toasted with *airag,* the intoxicating national beverage made of fermented mares' milk. *See* Memorandum of Points and Authorities in Opposition to Defendant's Cross-Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Reply Brief") at 3; Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Brief") at 1; Transcript of Oral Argument (Oct. 17, 2002) ("Tr.") at 67-68 (alluding to the experiences of Plaintiff's representatives in the company of Mongolian Customs officials).

Although the setting of this dispute may seem picturesque, the legal issues presented could not be more practical: The timeliness and sufficiency of a Notice to Redeliver challenging the country of origin of a shipment of jackets imported into the United States by plaintiff Essex Manufacturing, Inc. ("Essex"). At the time of entry, the merchandise was represented as made in Mongolia, and thus exempt from textile quotas or other import restrictions. The jackets were conditionally released to Essex by the U.S. Customs Service ("Customs").[1] But Customs soon learned that the Mongolian Certificate of Origin submitted for the goods could not be verified, and – indeed – appeared to be fraudulent. Customs demanded redelivery of the goods; but, unbeknownst

---

[1]The Customs Service is now known as the Bureau of Customs and Border Protection of the newly-established U.S. Department of Homeland Security. *See* H.R. Doc. 108-32, at 4 (2003).

to Customs, the merchandise had already been shipped to Essex's customer, and was therefore no longer available for redelivery. After struggling in vain for several months in an attempt to establish the validity of the Certificate of Origin and resolve Customs' concerns, Essex filed a protest disputing the Notice to Redeliver.[2]

In this action, Essex challenges Customs' decision denying Essex's protest. Jurisdiction lies under 28 U.S.C. § 1581(a) (2000). Denials of protests are subject to *de novo* review. 19 U.S.C. § 2640(a)(1) (2000). Now pending before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Cross-Motion is granted.

## I. **Background**

Although the conclusion below actually turns on a handful of relatively straightforward facts, a more complete narrative of the history of the parties' dealings sheds light on their many nuanced arguments.

On July 31, 2000, Essex entered a shipment of more than 43,500 ladies' 100% nylon packaway jackets into the United States through the Port of Los Angeles. The entry documents

---

[2]Under Customs regulations, a failure to comply with a demand for redelivery results in the assessment of liquidated damages. The parties to this action differ as to the extent of Essex's exposure. Pointing to 19 C.F.R. § 113.62(*l*), Essex has asserted that, if the demand for redelivery is sustained, it is liable for liquidated damages equal to three times the value of the merchandise at issue. *See* Tr. at 27. But, in an April 21, 2003 teleconference with the Court, the Government advised that Essex's exposure is actually limited to the value of the merchandise (which is, admittedly, nevertheless a substantial sum). *See* 19 C.F.R. § 141.113(b) (2000). *See also* 59 Fed. Reg. 61,798 (Dec. 2, 1994) (explaining, *inter alia*, the rationale for limiting liquidated damages to value of merchandise, rather than imposing treble damages as suggested in proposed rule).

initially filed with Customs did not include a Form A Certificate of Origin. However, the Multiple Country Declaration which was submitted indicated that the jackets were produced in Mongolia by processes of "cutting, sewing, buttoning, ironing, [and] packing," using 100% nylon material which had originated in China. *See* Plaintiff's Statement of Material Facts As To Which No Genuine Issue Exists ("Pl.'s Statement of Facts") ¶¶ 1-2, Exh. A; Defendant's Response to Plaintiff's Statement of Material Facts ("Def.'s Response to Pl.'s Statement of Facts") ¶¶ 1-2; Defendant's Statement of Undisputed Material Facts ("Def.'s Statement of Facts") ¶ 12; Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Response to Def.'s Statement of Facts") ¶ 12.

Other documents included with the entry papers – the Entry Summary, the Invoice, the Packing List, and the Combined Transport Bill of Lading – also identified Mongolia as the merchandise's country of origin. But the Multiple Country Declaration was signed by a shipping clerk at a company in Hong Kong (a special administrative region of China); the Invoice was signed on behalf of and on the letterhead of the same Hong Kong company; and the Packing List was on the company's letterhead as well. No company with a Mongolian address was identified as the manufacturer of the jackets. Similarly, the Combined Transport Bill of Lading indicated, *inter alia*, that the place of receipt and the port of loading for the jackets was a city in China, and that the port of discharge was Long Beach, California; but it did not identify any place in Mongolia where the shipment was said to have originated. *See* Def.'s Statement of Facts ¶¶ 7-10; Pl.'s Response to Def.'s Statement of Facts ¶¶ 7-10; Declaration of Bernice J. Conley ("Conley Decl."), Exh. 1.

At the time, the types of nylon jackets here at issue were not subject to textile quotas or other import restrictions if they were assembled in Mongolia. But quota restraints did apply to such

merchandise of Chinese origin, providing an incentive to transship Chinese goods through Mongolia and submit false documents claiming that the goods were of Mongolian origin. *See* Pl.'s Statement of Facts ¶¶ 1-2; Def.'s Response to Pl.'s Statement of Facts ¶¶ 1-2; Def.'s Statement of Facts ¶ 5; Pl.'s Response to Def.'s Statement of Facts ¶ 5. While an importer may be faultless in such situations, its suppliers may not.[3]

To combat fraud, Mongolian Customs requires that all exports of apparel from that country be covered by a Certificate of Origin, which is issued by the Mongolian Chamber of Commerce and Industry ("MCCI"), and then registered and cleared by Mongolian Customs prior to exportation. Given the ease with which a wide variety of official-looking forms can be generated from any home computer, it would be a relatively simple matter for an unscrupulous overseas supplier to generate a Certificate of Origin and other business forms to give the appearance of Mongolian origin. To guard against such counterfeiting, Mongolian Customs inserts secret marks in the Certificates of Origin that are properly registered and cleared. Those secret marks – the location of which is changed from time to time – enable customs officials in Mongolia and the U.S. to identify false

---

[3]Although it cites no record evidence on point, Essex vigorously disputes any implication of an incentive to transship in this case. Essex not only maintains that the goods at issue were of Mongolian origin, but also asserts that – at the time the merchandise was exported – the Chinese textile quota limit for nylon jackets had not yet filled. Thus, Essex concludes, "there would presumably have been no impediment to securing permission to ship such garments from China to the United States." Pl.'s Reply Brief at 3 n.1.

In contrast, evidence proffered by the Government indicates that "[a]t the time of importation, . . . quota restraints . . . were essentially filled, which provided an incentive to transship and submit false origin documents." Conley Decl. ¶ 7.

Certificates, protecting a wide range of business and public interests.[4] Pursuant to a standing arrangement with authorities in that country, U.S. Customs now relies on Certificates of Origin as the primary and most reliable means of verifying the country of origin of textiles purporting to be from Mongolia. *See* Conley Decl. ¶¶ 8-9; Declaration of Susan Thomas ("Thomas Decl.") ¶¶ 5-6; Def.'s Statement of Facts ¶ 11; Pl.'s Response to Def.'s Statement of Facts ¶ 11.

Immediately after Essex filed the entry papers on July 31, 2000, Customs released the goods here at issue.[5] Essex then moved the merchandise to a warehouse, and inspected it. *See* Pl.'s Statement of Facts ¶ 3; Def.'s Response to Pl.'s Statement of Facts ¶ 3; Def.'s Statement of Facts ¶ 2; Pl.'s Response to Def.'s Statement of Facts ¶ 2.

In the course of a routine "post entry" review of the entry papers conducted on August 16, 2000, Customs realized that the documents that Essex had submitted did not include a Mongolian

---

[4]For example, Mongolia wants to protect and encourage its own domestic industries; and Mongolian producers and importers of Mongolian textiles alike would be at a competitive disadvantage if they had to compete with exporters who transshipped their goods through Mongolia while claiming Mongolia as the country of origin. *See generally* Memorandum in Support of Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply Brief") at 7.

[5]Customs' release of the goods was inadvertent. Essex's broker apparently misrouted the entry papers to Customs' inspection unit, instead of the import specialist team. If the entry papers had been routed to the import specialist team in first place, Customs would not have released the goods. *See* Def.'s Statement of Facts ¶ 2; Pl.'s Response to Def.'s Statement of Facts ¶ 2.

In any event, as discussed in section III.A below, even goods that have been physically released from Customs' custody are generally deemed to have been *conditionally* released and are therefore subject to recall ("redelivery") for some period of time thereafter, known as the "conditional release period."

Certificate of Origin.  Customs therefore phoned Essex's broker.  In that conversation:

> Customs advised Essex that there was no Certificate of Origin with the entry papers, that Customs was requesting one, and that a redelivery notice (Customs Form CF 4647) was being issued.  Essex was also advised that the importer should hold the shipment pending receipt and verification of the Certificate of Origin from Mongolia.

Def.'s Statement of Facts ¶¶ 3-4, 14.  *See also* Pl.'s Response to Def.'s Statement of Facts ¶¶ 3-4, 14.

That same day – August 16, 2000 – Customs issued to Essex a Customs Form 4647 Notice to Mark and/or Notice to Redeliver (the "Initial Notice to Redeliver" or "Initial Notice").  In the space on the form provided for "Statute(s)/Regulation(s) Violated" (Block 9), Customs did not cite a particular statute or regulation, but instead checked the box marked "Other, Namely" and inserted the words "Certificate of origin for Mongolia."  Elsewhere on the form, in the space reserved for "Remarks/Instructions/Other Action Required of Importer" (Block 15), Customs wrote:  "Please submit the original Mongolian Certificate of Origin and a sample of Jacket s/no. 217W.  If you are unable to obtain the Certificate of Origin, please redeliver the merchandise into Customs Custody within 30 days."  *See* Pl.'s Statement of Facts ¶ 4, Exh. B; Def.'s Response to Pl.'s Statement of Facts ¶ 4.

On August 22, 2000, in response to the Initial Notice to Redeliver, Essex (through its broker) faxed to Customs a document which appeared to be a Mongolian Certificate of Origin.  The document was numbered No. MN US 1917 A0002400, and represented that the merchandise at issue had been consigned from Mongol Jindu Garment Co., Ltd., Bayangol District, Ulaanbaatar, Mongolia, and had been produced in Mongolia.  The form was purportedly certified by the Mongolian Chamber of Commerce and Industry, and stamped by Mongolian Customs.  On the fax

coversheet, Essex's broker wrote: "As per our phone conversation find the Mongolian Certif. of Origin for you to verify. . . . If this shipment is OK will you please let me know by phone so that Essex can ship it to Walmart [sic]." In fact, however, the goods had already been shipped.[6] *See* Pl.'s Statement of Facts ¶¶ 6-7, Exhs. C, D; Def.'s Response to Pl.'s Statement of Facts ¶¶ 6-7; Def.'s Statement of Facts ¶¶ 16-17; Pl.'s Response to Def.'s Statement of Facts ¶¶ 16-17.

On August 22, 2000, counsel for Essex spoke with Customs, confirming the agency's receipt of the Certificate of Origin and the sample jacket. In a letter to Customs the following day, Essex's counsel stated his understanding that – in light of the submission of the Certificate of Origin and the sample – "the company is not, as of this time, under an obligation to redeliver the merchandise to Customs custody." *See* Pl.'s Statement of Facts ¶ 8, Exh. E; Def.'s Response to Pl.'s Statement of Facts ¶ 8; Def.'s Statement of Facts ¶ 19; Pl.'s Response to Def.'s Statement of Facts ¶ 19.

In response to Essex's letter of August 23, 2000, a Customs official left a phone message for Essex's counsel on August 29, advising that "although physical redelivery was not required at that time, [Essex] should continue to hold the merchandise pending Headquarters verification of the Certificate of Origin, because the Certificate of Origin submitted was 'unusual' and required verification between the two governments." Def.'s Statement of Facts ¶ 28. *Compare* Pl.'s Statement of Facts ¶ 8 (asserting that Customs never responded to Essex's August 23, 2000 letter) *with* Pl.'s Response to Def.'s Statement of Facts ¶ 28 (acknowledging Customs' August 29, 2000 phone message).

---

[6]It is not entirely clear precisely when Essex shipped the merchandise to Wal-Mart. However, Essex's counsel represented in the course of oral argument that the shipment date was probably August 16 or 17, 2000. Tr. at 66. *See also* Tr. at 26, 61.

Meanwhile, Customs had been taking steps to ascertain the authenticity of the Certificate of Origin. Because the Certificate lacked the secret marks then being used by Mongolian officials to identify legitimate Certificates of Origin from that country, Customs Headquarters faxed the Certificate to the U.S. Customs Attaché office in Beijing, China for verification. *See* Def.'s Statement of Facts ¶¶ 25-26; Pl.'s Response to Def.'s Statement of Facts ¶¶ 25-26.

On September 22, 2000, Customs Headquarters received a two-page fax from Mongolian Customs concerning the results of its investigation. Mongolian Customs reported that "No records are found that 'Mongol Jindu' company cleared 43506 pieces of goods for export with the certificate of origin MNUS 1917 - A0002400." Mongolian Customs also reported on the results of its investigations of two other unrelated Certificates of Origin, authenticating both. *See* Thomas Decl. ¶ 9, Exhs. B, C; Def.'s Statement of Facts ¶ 29; Pl.'s Response to Def.'s Statement of Facts ¶ 29.

Based on the information supplied by the Mongolian authorities, Customs determined that the Certificate of Origin provided by Essex was not valid. Customs concluded that, by submitting an invalid Certificate, Essex had misrepresented the country of origin of the merchandise at issue, so that the merchandise was not entitled to admission into U.S. commerce and should be redelivered into Customs' custody. *See* Def.'s Statement of Facts ¶ 31; Pl.'s Response to Def.'s Statement of Facts ¶ 31.

On September 25, 2000, Custom issued a second Customs Form 4647 Notice to Mark and/or Notice to Deliver (the "Amended Notice to Redeliver" or "Amended Notice"), which indicated in Block 10 that it was "*(Amended 9/25/00)*." Like the Initial Notice to Redeliver, Block 9 of the Amended Notice did not specify a particular statute or regulation violated. Instead, "Other, Namely"

was again checked, with the same notation: "Certificate of origin for Mongolia." Block 14 ("Action Required of Importer") instructed Essex that the "Merchandise must be redelivered to Customs within 30 days from the date of this notice or other time specified," and Block 15 further explained:

> Merchandise must be redelivered into Customs Custody. Per Mongolian Customs letter dated 9/22/00, "No records are found that 'Mongol Jindu' company cleared 43506 pieces of goods for export with the certificate of origin MNUS 1917 A0002400.["]

Pl.'s Statement of Facts ¶ 9, Exh. F. *See also* Def.'s Response to Pl.'s Statement of Facts ¶ 9; Def.'s Statement of Facts ¶¶ 32-33; Pl.'s Response to Def.'s Statement of Facts ¶¶ 32-33.

The weeks and months that followed were punctuated with frequent communications between Essex's representatives and Customs, as Essex sought to resolve Customs' concerns. Essex even dispatched representatives from its Hong Kong office to Ulaanbataar, and charged them with verifying the validity of the Certificate of Origin. The Essex personnel spent several weeks attempting to navigate the local bureaucracy, working with the Mongolian authorities and getting a "crash course" in the finer points of business entertaining "Mongolian style." *See* Pl.'s Statement of Facts ¶¶ 12-13; Def.'s Response to Pl.'s Statement of Facts ¶¶ 12-13; Affirmation [of Maria E. Celis] in Opposition to Defendant's Cross-Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment ("Celis Aff.") ¶ 10; Tr. at 23, 37, 67-70.

In the meantime, in phone conversations with Essex's counsel, Customs reiterated that the Certificate of Origin was invalid and that redelivery of the merchandise was required. Essex's counsel asserted that there must have been a mistake, and several times requested extensions of the deadline for redelivery, to try to clear things up with the Mongolian government. *See* Def.'s Statement of Facts ¶ 35; Pl.'s Response to Def.'s Statement of Facts ¶ 35.

Specifically, in phone conversations on October 16 and 17, 2000, Essex's counsel discussed the bases for the demand for redelivery with a Customs official, who confirmed that Customs Headquarters had verified that the Certificate of Origin was not authentic. By letter dated October 17, 2000, Essex's counsel provided Customs with certain documents related to the imported merchandise (*i.e.*, a bill of lading, a packing list, and an invoice), as evidence that the goods were of Mongolian origin. Noting that "ample time still remains on the special conditional release period for textile and apparel articles," Essex's counsel asked Customs to submit the Certificate of Origin for reverification and to withhold action on the Notice to Redeliver until the reverification process was complete. *See* Def.'s Statement of Facts ¶¶ 37-39; Pl.'s Response to Def.'s Statement of Facts ¶¶ 37-39; Celis Aff., Exh. B.

Honoring Essex's request, Customs forwarded the Certificate of Origin to the Customs Attaché in Beijing for reverification. By letter to Customs dated October 25, 2000, Essex's counsel confirmed that Customs had granted a 15-day extension of the original (October 25, 2000) deadline for redelivery. Appended to that October 25 letter was one of the fruits of the labors of Essex's emissaries to Ulaanbataar: a letter dated October 24, 2000, and captioned "Re: Form A No. MN US1917 A0002400," on what appears to be the letterhead of the Mongolian Chamber of Commerce and Industry – the entity which issues Mongolian Certificates of Origin. The MCCI letter was addressed "To Whom It May Concern," and purported to "certify that the above form [the Certificate of Origin specified in the caption] is legitimate and issued by our authorities." However, there was no copy of the Certificate of Origin attached to the MCCI letter. Moreover, the MCCI letter did not identify Mongol Jindu (or any other entity) as the company to which the Certificate of Origin had

been issued; nor did it identify or quantify the goods which were the subject of the Certificate.  *See* Celis Aff., Exh. C; Def.'s Statement of Facts ¶¶ 41-43; Pl.'s Response to Def.'s Statement of Facts ¶¶ 41-43; Pl.'s Statement of Facts ¶ 12, Exh. G; Def.'s Response to Pl.'s Statement of Facts ¶ 12.

On October 26, 2000, Customs again spoke with counsel for Essex, and extended the deadline for redelivery to November 25, 2000, or until Customs Headquarters completed reverification of the authenticity of the Certificate of Origin.  The following day, Customs received confirmation from Mongolian Customs and the MCCI – through the Customs Attaché in Beijing and the U.S. Embassy in Mongolia – that the Certificate of Origin was false.  The Mongolian government confirmed that Mongol Jindu did not export the merchandise at issue, and advised that, in fact, Mongol Jindu had made only two exports, totaling 25,000 pieces.  The Mongolian government also detailed its suspicions that the Certificate of Origin presented by Essex had been previously lost, stolen or forged.  That same day – October 27, 2000 – a Customs official informed Essex by phone that, because the reverification had been completed and the Certificate had again been found invalid, redelivery of the merchandise was required on or before November 25, 2000.  *See* Def.'s Statement of Facts ¶¶ 44-46, 48; Pl.'s Response to Def.'s Statement of Facts ¶¶ 44-46, 48.  *See also* n.24, *infra*.

In a November 17, 2000 call to Customs Headquarters, counsel for Essex notified Customs that Essex had received a letter from the Mongolian Customs Administration, authenticating the Certificate of Origin.  However, due to concerns about the potential for fraud, U.S. Customs and Mongolian authorities have agreed – as a matter of policy – that all communications concerning the authenticity of Mongolian Certificates of Origin must be exclusively between government offices.  Customs Headquarters therefore advised Essex's counsel that any such letter from Mongolian

Customs would have to be delivered government-to-government, through official diplomatic channels. *See* Def.'s Statement of Facts ¶¶ 49-50; Pl.'s Response to Def.'s Statement of Facts ¶¶ 49-50.

Essex's counsel again contacted Customs Headquarters on November 20, 2000, and was informed that the letter from Mongolian Customs had not been received. The next day, Essex's counsel called Headquarters once more. Customs again reiterated that all communication must be government-to-government, and informed counsel that any letter transmitted through counsel would have to be verified for authenticity. *See* Def.'s Statement of Facts ¶¶ 51-54; Pl.'s Response to Def.'s Statement of Facts ¶¶ 51-54.

On or about November 22, 2000, Essex wrote to Customs authorities in California, stating that it had obtained a letter of verification from Mongolian Customs, and asking that Customs withhold enforcement of the demand for redelivery pending Customs' "imminent receipt" of the Mongolian Customs letter through normal diplomatic channels. The letter obtained by Essex – on what appeared to be Mongolian Customs' letterhead, dated November 14, 2000 and addressed to a U.S. Customs official – purported to certify the validity of the Certificate of Origin. However, Customs never received the November 14, 2000 letter through official channels. *See* Pl.'s Statement of Facts ¶ 13, Exh. H; Def.'s Response to Pl.'s Statement of Facts ¶ 13; Def.'s Statement of Facts ¶¶ 55-57; Pl.'s Response to Def.'s Statement of Facts ¶¶ 55-57.

On November 23, 2000, Customs Headquarters received a one-page fax consisting of a fax coversheet (dated "23.11.00") seemingly transmitted by the Embassy of Mongolia in Washington, D.C., addressed to U.S. Customs and "cc'd" to counsel for Essex. The message on the coversheet

stated, in part, that it was confirming "the authenticity of [the] certificate of origin" at issue. It also named the Mongol Jindu factory, and referred to the export of 43,605 garments to the United States. The message on the coversheet concluded with a statement that "[t]his confirmation is based on letter by Mongolian Customs on November 14, 2000." *See* Def.'s Statement of Facts ¶¶ 58, 61; Pl.'s Response to Def.'s Statement of Facts ¶¶ 58, 61; Thomas Decl., Exh. H.

However, there was no letter dated November 14, 2000 attached to the fax coversheet. Nor was there any indication how the Mongolian Embassy had become involved, or whether the Embassy was in possession of the November 14, 2000 letter and, if so, why. Further, the number shown for Customs on the fax coversheet was a phone number, not a fax number; thus, a fax sent to that number could not have gone through. Moreover, the Mongolian Embassy later confirmed that the Embassy in fact did not send the fax. *See* Def.'s Statement of Facts ¶¶ 59, 60, 62; Pl.'s Response to Def.'s Statement of Facts ¶¶ 59, 60, 62.

Essex contacted Customs Headquarters again on November 29, 2000, inquiring whether Customs' position had changed. Essex was advised that Mongolian authorities had twice confirmed that the Certificate of Origin was not authentic, and that Customs would not seek verification a third time. *See* Def.'s Statement of Facts ¶ 63; Pl.'s Response to Def.'s Statement of Facts ¶ 63.

Because the merchandise had not been redelivered, Customs contacted Essex on December 7, 2000. Essex, in turn, advised that it had contacted Customs Headquarters concerning reverification. In the course of conversation, Essex's counsel advised Customs for the first time that the merchandise was no longer available for redelivery. *See* Def.'s Statement of Facts ¶ 64; Pl.'s Response to Def.'s Statement of Facts ¶ 64.

A week later, on December 14, 2000, Customs Headquarters received a fax from the U.S. Embassy in Mongolia, attaching a translation of a letter from Mongolian Customs. The letter from Mongolian Customs disavowed writing any letter to U.S. Customs dated November 14, 2000, and reiterated that Mongol Jindu had not exported merchandise under the Certificate of Origin in question. In the same letter, Mongolian Customs also responded to U.S. Customs' inquiries concerning the authenticity of two other Certificates of Origin in unrelated matters, advising that one Certificate was authentic and the other was not. *See* Def.'s Statement of Facts ¶ 65; Pl.'s Response to Def.'s Statement of Facts ¶ 65.

On December 20, 2000, Essex filed the protest which underlies this action, challenging the Amended Notice to Redeliver. Customs denied the protest on January 9, 2001, on the strength of the verifications conducted by the Mongolian government, which confirmed that the Certificate of Origin submitted by Essex was not valid. *See* Def.'s Statement of Facts ¶ 66; Pl.'s Response to Def.'s Statement of Facts ¶ 66; Conley Decl., Exh. 21. This action followed.

## II. Standard of Review

Summary judgment is a favored procedural device "to secure the just, speedy and inexpensive determination of [an] action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (*quoting* Fed. R .Civ. P. 1); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). Nevertheless, under USCIT Rule 56(c), summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to . . . judgment as a matter of law." *See generally* Celotex, 477 U.S. at 322-23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Int'l Trading Co. v. United States, 24 CIT 596, 599, 110 F. Supp. 2d 977,

981 (2000), *aff'd*, 281 F.3d 1268 (Fed. Cir. 2002). Summary judgment thus will not lie if a dispute about a material fact is "genuine," *i.e.*, if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. at 248.

It is also true, however, that there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a fact-finder to return a verdict for that party. *Id*. at 249 (citations omitted). In this respect, the standards for summary judgment and directed verdict mirror one another. *Id.* at 250, 251-52. In short, "[t]he mere existence of a scintilla of evidence" is insufficient to defeat summary judgment. *Id.* at 252. If the nonmoving party's evidence is "merely colorable," or is "not significantly probative," summary judgment may be granted. *Id*. at 249-50 (citations omitted).

As both parties here note, there is no genuine dispute as to any material fact in this case; and, as discussed in greater detail below, the sole remaining issues are questions of law – specifically, the timeliness, and the legal sufficiency, of Customs' Amended Notice to Redeliver. *See generally* Pl.'s Brief at 9; Pl.'s Reply Brief at 6-7; Def.'s Brief at 11-12. Accordingly, the matter is ripe for summary judgment.

## III. Analysis

As a preliminary matter, Essex contends that the Amended Notice to Redeliver was untimely, and is therefore "illegal, null and void." *See* Pl.'s Brief at 1, 9, 20-22; Pl.'s Reply Brief at 3, 7-8, 20. But Essex's principal argument is that the Amended Notice is legally defective because it assertedly does not identify a violation of "any law or regulation governing admission of merchandise into the

United States, nor [does] it assert any other legally cognizable basis for redelivery."[7]  *See* Pl.'s Brief

_____

[7]Essex has recast the "adequacy of notice" issue numerous times over the course of this litigation.  A number of its alternative formulations are quite expansive, and could be read to raise other, more substantive issues.  *See, e.g.*, Pl.'s Brief at 15 (asserting that "[t]he question presented . . . is whether the [Amended] Notice to Redeliver was issued upon a legally proper basis and upon legally required procedures"); Tr. at 3 (asserting that the issue is whether the [Amended] Notice to Redeliver "exclude[d] [Essex's] goods from the United States on legitimate grounds"), 7-8 (asserting that "the question is . . . would any alleged irregularities in the Mongolian Certificate of Origin be a sufficient ground for the exclusion of [Essex's] merchandise?  Would it violate a law or regulation?"), 114 (asserting that the issue is "whether [the Amended Notice to Redeliver] is [a] valid decision, based on valid grounds"), 149 (framing issue as "whether that Government . . . decision [demanding redelivery] is legitimate"), 164-65 (asserting that "what matters . . . is really the country of origin of the product.  Was the country of origin of the product correctly stated as Mongolia?").

Significantly, the issue in this case is *not* the correctness of Customs' decision in issuing the Amended Notice to Redeliver.  Thus, whether or not Customs correctly determined that the Certificate of Origin misrepresented the imported merchandise's country of origin, and whether or not the merchandise was in fact of Mongolian origin, are not at issue here.  *See* Pl.'s Brief at 16 (notice need not "prove the sufficiency of the reason claimed"); Def.'s Brief at 2, 24; Def.'s Reply Brief at 1-2; Tr. at 76-77, 100, 140.  Nor is the issue the reasonableness of Customs' heavy reliance on Mongolian Certificates of Origin, or whether Customs was receptive in this case to other evidence as proof of country of origin.  *See* Tr. at 86-87, 99-100.  *See also* n.25, *infra*.  Various other issues raised in Essex's papers are similarly off-point.

When pressed at oral argument (*see, e.g.*, Tr. at 147, 175-77), counsel for both parties agreed that the narrow issue presented here is the formal adequacy of the Amended Notice to Redeliver.  *See, e.g.*, Tr. at 77 (counsel for Essex states that "[T]he issue before the Court is the adequacy of the Redelivery Notice"), 78 (counsel for Government frames issue as "[w]hether the notice was legally adequate . . . [and] did it direct the Plaintiff's attention to the country of origin not being validly represented"), 115 (counsel for Essex indicates that issue is "the adequacy of the notice.  Did the notice adequately tell [Essex] that the Government had determined [it] had violated a specific law, or a specific regulation?"), 140 (counsel for Essex acknowledges that limited issue is whether a reasonable importer would have been on notice of Customs' country of origin concerns), 176-78 (counsel for Essex acknowledges that narrow issue of adequacy of notice – "whether the Government . . . stated adequately the reasons for the action it took" – is the only jurisdictionally-preserved point).  *See generally* Def.'s Brief at 1 (identifying issue as "whether Essex had reasonable notice under the surrounding circumstances of Customs' reason for demanding redeliver"), 9 (framing issue as "[u]nder the surrounding circumstances, was . . . [the] Notice to Redeliver legally sufficient because it put a reasonable importer on notice that Customs' demand for redelivery

at 1, 9, 10-20; Pl.'s Reply Brief at 1-3, 7-20.  Essex's arguments are addressed in turn below.

## A.  Timeliness of Amended Notice to Redeliver

Under Customs regulations, imported goods generally are subject to recall by Customs within 30 days following their release, under a 30-day "conditional release" period established in 19 C.F.R. § 113.62(d).  However, under another regulation – 19 C.F.R. § 141.113(b) – textiles and textile products are subject to a special extended conditional release period of 180 days for the purpose of investigating country of origin:

> *For purposes of determining whether the country of origin of textiles and textile products . . . has been accurately represented to Customs, the release from Customs custody of any such textile or textile product shall be deemed conditional during the 180-day period following the date of release.*  If the port director finds during the conditional release period that a textile or textile product is not entitled to admission into the commerce of the United States because the country of origin of the textile or textile product was not accurately represented to Customs, he shall promptly demand its return . . . .

19 C.F.R. § 141.113(b) (2000) (emphases added).[8]

Essex contends that the applicable conditional release period in this case was 30 days, not 180 days.  According to Essex, the 180-day period set forth in 19 C.F.R. § 141.113(b) applies only if Customs first affirmatively "*makes a determination* that the [textile goods'] country of origin

_____

originated from a determination that the . . . Certificate of Origin . . . misrepresented the country of origin . . . ?"); Def.'s Reply Brief at 1-2 (essentially the same).

[8]For purposes other than country of origin issues, even textiles and textile products are subject only to the 30-day conditional release period established in 19 C.F.R. § 113.62(d).  *See* 59 Fed. Reg. 61,798 (Dec. 2, 1994) (noting that extended 180-day conditional release period is not applicable "to issues of classification, valuation or other issues of admissibility not related to a transshipment violation").

declared by the importer is incorrect." Pl.'s Reply Brief at 7.[9] Arguing that Customs in this case failed to properly challenge the asserted country of origin within 30 days of July 31, 2000 (the date of the merchandise's release from Customs' custody), Essex concludes that the Amended Notice to Redeliver was untimely. *See generally* Pl.'s Brief at 20-22; Pl.'s Reply Brief at 7-8, 10, 20.

Essex's timeliness argument is premised on a fundamental misreading of § 141.113(b). By its terms, that regulation applies to all imported textiles and textile products, and automatically extends the applicable conditional release period to 180 days for purposes of country of origin determinations. Essex has pointed to nothing which suggests that Customs must take any action to trigger the applicability of the 180-day period; certainly nothing on the face of the regulation suggests that any such action is required.

Essex's reliance on United States v. So's USA Co., 23 CIT 605, 611 (1999), is misplaced. Essex cites that case as authority for the proposition that "a notice, regulatory or otherwise, is essential to the establishment or extension of a conditional release period"; that the period ends once the importer responds as requested by Customs in the notice; and that a demand for redelivery is invalid if made more than 30 days after the end of the conditional release period. Pl.'s Brief at 21-22. But, as the Government notes, So's USA involved face cream, not textiles; and, as the court in that case observed, "there was no finite regulatory conditional release period established" for the

_____

[9]*See also* Pl.'s Reply Brief at 10 (asserting that "a mere 'inquiry' concerning country of origin is not sufficient to trigger the 180-day extended conditional release period"), 15 (asserting that the 180-day extended conditional release period "is triggered only when the port director . . . makes a finding concerning . . .country or origin, and determines that the good is not admissible into the United States"); Tr. at 48 (Essex's counsel argues that "in order to invoke the hundred and eighty day period, the Port Director of Customs needs to make a specific finding.").

entry there at issue.  Def.'s Brief at 27 (*quoting* 23 CIT at 610).

In this case, the situation is quite different.  In this case, the "finite regulatory conditional release period" was reflected in the regulations themselves.  Anytime textiles or textile products are imported, § 141.113(b) comes into force.  Thus, for purposes of reviewing country of origin, the merchandise in this case was automatically subject to the special 180-day conditional release period under § 141.113(b) – *not* the general 30-day conditional release period under § 113.62(d); and Essex was given "deemed" notice of the 180-day conditional release period, as a matter of law.[10]

Indeed, quite apart from its *deemed* notice, Essex's dealings with Customs evidence its *actual*, *objective* awareness of the applicability and operation of the 180-day period.  In an October 17, 2000 letter to U.S. Customs, Essex's counsel acknowledged that "ample time" then still remained on "the special conditional release period for textile and apparel articles."  *See* Celis Aff., Exh. B. The phrase "special conditional release period" can only be a reference to 19 C.F.R. § 141.113(b).

---

[10]This conclusion, based on the plain language of 19 C.F.R. § 141.113(b), is reinforced by the history of that regulation.  As the Government notes, the reading urged by Essex would severely restrict the time available to Customs to verify the country of origin of textile products.  It was precisely because of the problems inherent in completing such verifications within 30 days that the regulations were amended (effective 1995) to provide for the 180-day conditional release period that now governs the issue of the country of origin of imports of textiles and textile products.  *See* Def.'s Brief at 20-21 (*citing*, *inter alia*, T.D. 94-95, 28 Cust. B. & Dec. No. 50 (Oct. 24, 1994) ).  *See also* 59 Fed. Reg. 61,798 (Dec. 2, 1994) (notice of promulgation of final rule, detailing rationale for amending Customs regulations to establish special extended 180-day conditional release period for entries of textiles and textile products, for sole purpose of facilitating determination of whether country of origin has been accurately represented) (reprinting T.D. 94-95).

Customs has consistently interpreted 19 C.F.R. § 141.113(b), together with 19 C.F.R. § 12.130(g), in the same way in which those regulations were applied in the case at bar.  *See*, *e.g.*, HQ 962748 (Apr. 24, 2000); HQ 959871 (May 10, 1999).  As the Government observes, such prior rulings are entitled to Skidmore deference.  *See* Def.'s Brief at 22-23 (*citing* United States v. Mead Corp., 533 U.S. 218 (2001); Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

Here, the 180-day conditional release period established in § 141.113(b) began on July 31,

2000 (the day the goods were entered and then released). Customs therefore had until January 27,

2001 to determine whether Essex had accurately represented the country of origin, and whether the

merchandise at issue should be admitted into U.S. commerce – and another 30 days after that to issue

a Notice to Redeliver. *See* 19 C.F.R. § 113.62(d) (demand for redelivery must be made no later than

30 days after end of conditional release period).[11] Thus, both Notices to Redeliver – the first, issued

on August 16, 2000, and the second (the Amended Notice to Redeliver), issued on September 25,

2000 – were issued well within the prescribed regulatory time frame.[12] In short, there can be no

---

[11]*See also* 59 Fed. Reg. 61,798 (Dec. 2, 1994) (noting that amendment of regulations to establish 180-day conditional release period "will permit Customs to issue Notices of Redelivery to importers of textiles and textile products *within 30 days after the end of the [180-day] conditional release period* if investigation or information reveals [that country of origin has been misrepresented].") (emphasis added); Def.'s Brief at 20 n.10 (noting that "a demand for redelivery of textile products under § 113.62 presumably could be made within the 30-day period following the 180-day 'deemed' conditional release period specified by § 141.113(b)"), 26 (noting that § 113.62(d) provides that a redelivery demand may be made "30 days after the end of the conditional release period"; thus, "[s]ince the release of a textile product is deemed conditional for 180 days pursuant to § 141.113(b), Customs' demand for redelivery is timely where made within 30 days following January 27, 2001.").

[12]Essex variously claims that, with its submission of a sample and the Certificate of Origin, Customs' Initial Notice to Redeliver was "canceled," or "rescinded," or "withdrawn." *See*, *e.g.*, Pl.'s Response to Def.'s Statement of Facts ¶¶ 14, 24; Celis Aff. ¶ 5; Pl.'s Brief at 4-5, 22. The Government takes strong exception to that claim. *See*, *e.g.*, Def.'s Statement of Facts ¶¶ 20 n.3, 21-23, 28; Def.'s Response to Pl.'s Statement of Facts ¶¶ 5, 8; Conley Decl. ¶¶ 16, 18-19, 38; Def.'s Brief at 3-4; Def.'s Reply Brief at 9-10.

Although it is somewhat unclear, it appears that Essex's claim is a defensive maneuver, premised on the assumption that the applicable conditional release period was 30 days, and that the Amended Notice was therefore untimely. Essex's claim of "cancellation" is thus apparently intended to foreclose any potential argument that the Initial Notice extended the conditional release period. *See* Pl.'s Brief at 22. However, the entire construct hinges on Essex's assertion that the conditional release period is governed by § 113.62(d). As discussed above, the applicable

claim that the Amended Notice to Redeliver was untimely.[13]

## B. **Legal Sufficiency of Amended Notice to Redeliver**

Essex's case on the adequacy of notice fares no better than its case on timeliness. Customs

here sought redelivery under 19 C.F.R. § 141.113(b),[14] based on its determination that the Certificate

_____

conditional release period is in fact the 180-day period set forth in § 141.113(b), not the 30-day period set forth in § 113.62(d). Essex's "cancellation" argument thus seems to be irrelevant.

The Government suggests that Essex may be hinting at a more far-reaching argument – specifically, that Essex may be asserting that, whatever the duration of the conditional release period, Customs granted an unconditional release of the goods when Essex supplied the sample and the Certificate of Origin. *See generally* Def.'s Reply Brief at 9. However, Essex's counsel has disclaimed any such theory. *See* Tr. at 60 (counsel for Essex disavowing any suggestion that the August 22, 2000 phone conversation resulted in an unconditional release). *See also* Pl.'s Brief at 5 (asserting that purpose of August 22, 2000 phone call to Customs was to "confirm[] that the requested certificate and sample had been provided, and that Essex was no longer under an obligation to redeliver the goods"); Tr. at 26 (counsel for Essex asserts only that, after providing sample and Certificate of Origin, Essex was "no longer under an obligation to re-deliver under that first notice"), 61 (counsel for Essex explains, "[W]hat I wanted to confirm with [Customs] was, 'Okay, we've given you the certificate and the sample. This means we don't have to re-deliver these goods thirty days from August 16[th].' And [the representative of Customs] said, 'That's right.' That's all I wanted to know, at that time.").

Indeed, as the Government observes, it would be ludicrous to claim that Essex's submission of a (then unverified) Certificate of Origin and sample forever barred Customs from demanding redelivery. *See* Def.'s Brief at 3-4; Def.'s Reply Brief at 9-10.

[13]It is worth noting that, although Essex has here argued strenuously that the merchandise at issue was subject to a conditional release period of 30 days rather than 180 days, Essex was no more able to redeliver the merchandise at 30 days than it was at 180 days. As Essex has candidly admitted, the goods were shipped to Wal-Mart in mid-August 2000 – only a little more than two weeks after the conditional release period began to run on July 31, 2001. Tr. at 66. *See also* Tr. at 26, 61.

[14]As discussed in section III.A immediately above, Essex asserts that this case is governed by 19 C.F.R. § 113.62(d), not § 141.113(b). *See, e.g.*, Pl.'s Brief at 20-22; Pl.'s Reply Brief at 20. Interestingly, scrutiny of the evidentiary record reveals that none of the parties' many

of Origin submitted by Essex misrepresented the country of origin of the merchandise at issue.  *See*

communications prior to Essex's protest mentioned either regulation (although counsel for *Essex* alluded to *§ 141.113(b)* in its October 17, 2000 letter).  In any event, it seems self-evident that the Government's word as to the regulatory basis for its own actions should be accepted at face value (at least absent any circumstances, not present here, which might cast doubt on the Government's statements).

Moreover, on its face, § 141.113(b) is more clearly relevant.  Under § 113.62(d), Customs is authorized to require the redelivery of merchandise which has been conditionally released from its custody, if the merchandise:

(1)      Fails to comply with the laws or regulations governing admission into the United States;

(2)      Must be examined, inspected or appraised . . . ; or

(3)      Must be marked with the country of origin . . . .

19 C.F.R. § 113.62(d) (2000).  Thus, while § 141.113(b) ("Textiles and textile products") deals specifically and exclusively with the recall of textiles and textile products, § 113.62(d) ("Agreement to Redeliver Merchandise") is a general regulation concerning the redelivery of goods under the basic importation and entry bond conditions.

In any event, the parties' positions on the applicability of § 141.113(b) *versus* § 113.62(d) appear to be largely driven by their implications for the duration of the applicable conditional release period – 180 days under § 141.113(b) *versus* 30 days under § 113.62(d).  *See generally* Pl.'s Brief at 20-22; Pl.'s Reply Brief at 20; Def.'s Brief at 26-28; Def.'s Reply Brief at 8.  The parties' arguments on the applicability of one regulation or the other therefore relate primarily to (and have greater significance for) the issue of the timeliness of notice (an issue resolved in section III.A, above), and have relatively little, if any, direct bearing on the issue here – the adequacy of notice.

Finally, it is noteworthy that, notwithstanding certain seemingly unequivocal assertions, the Government has not entirely divorced its case from § 113.62(d).  For example, in arguing the timeliness issue, the Government's briefs emphasize the interplay of §§ 141.113(b) and 113.62(d) (which, read together, provide for a 180-day "conditional release" period for the investigation of country of origin claims, with any demand for redelivery to be made within "30 days after the end of [that] conditional release period").  *See* Def.'s Brief at 20 n.10, 26 (*quoting* 19 C.F.R. § 113.62(d) (2000) ).  It thus seems clear that the two regulations are not mutually exclusive, but instead actually complement one another, and should be read *in pari materia*.

Def.'s Brief at 11, 19-22, 26; Conley Decl. ¶¶ 21, 35, 40, 43. Essex acknowledges that Customs was entitled to require redelivery if it determined that the country of origin was not accurately represented. Pl.'s Brief at 11. But Essex maintains that the Amended Notice to Redeliver failed to adequately apprise Essex of the bases for Customs' demand, and was therefore legally defective.[15]

---

[15]In connection with its "adequacy of notice" claim, Essex's briefs advance a number of other arguments which bear, at best, a tangential relationship to the matters properly at issue in this action.

Essex charges, for example, that Customs in this case failed to adhere to its own "well-publicized procedure for verifying country of origin statements . . ., [Textile Book Transmittal] *TBT-98-018*, a published directive entitled *Guidelines for Entry Document Review to Substantiate Country of Origin for Textiles and Textile Products*" (*see* Pl.'s Reply Brief at 2, Exh. A; *see also id.* at 11-12, 18; Tr. at 28, 30, 132-33, 137), and that no law, regulation or directive requires the submission of a Certificate of Origin in a case such as this. Essex argues that it therefore follows that "irregularities" in the Certificate of Origin at issue cannot lawfully serve as the basis for a demand for redelivery. *See* Pl.'s Brief at 4 n.3, 13, 19-20; Pl.'s Reply Brief at 2, 7, 14, 16-19; Tr. at 6-8.

However, the premise of Essex's argument is wrong. Where, as here, Customs "is unable to determine the country of origin of an article from the information set forth in the declaration," Customs is entitled to require further documentation, and the importer "*shall* submit such additional documentation as requested." 19 C.F.R. § 12.130(g) (2000) (emphasis added). Customs officials thus were clearly within their rights in requiring Essex to submit further documentation to establish the country of origin of the merchandise at issue.

Indeed, TBT 98-018 amplifies § 12.130(g), by identifying the types of documents that Customs may wish to seek, which "include, *but are not limited to*, records relative to the raw materials, cutting, production, subcontract, outprocessing, *export*, and letter of credit-proof of payment." Pl.'s Reply Brief, Exh. A (emphases added). A Mongolian Certificate of Origin – issued by the Mongolian Chamber of Commerce and Industry, and registered and cleared by Mongolian Customs – is plainly an "export" document, and thus falls squarely within the documents contemplated by TBT 98-018. But, even if it did not, the very language of TBT 98-018 – "include, but are not limited to" – makes it clear that the list of documents in TBT 98-018 is not exclusive.

Customs' right to require the submission of additional documentation to substantiate country of origin claims disposes of another Essex argument – specifically, Essex's claim that the rulemaking requirements of the Administrative Procedures Act barred Customs from requiring Essex to submit a Certificate of Origin. *See* Pl.'s Reply Brief at 17-18. Nothing requires Customs to promulgate a

*See generally* Pl.'s Brief at 10-19; Pl.'s Reply Brief at 9-20.

To be sure, the Amended Notice to Redeliver was not a model of clarity. However, perfection is not the governing legal standard. As the Government observed in its opening brief, "[w]hile many variants of wording could have been used by Customs, some perhaps better than others, the issue is not what wording is *ideal*, but what wording is *legally sufficient* to put a *reasonable importer* on notice." Def.'s Brief at 15 (emphases added). As the Supreme Court has held, due process in a situation such as this requires simply "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citations omitted).[16] Thus, Essex here was entitled to notice sufficient, under all the circumstances, to apprise a reasonable importer of the basis for Customs' redelivery demand.

_____

regulation devoted specifically to the subject of Mongolian Certificates of Origin. As discussed immediately above, rulemaking has already provided Customs with the necessary authority, under 19 C.F.R. § 12.130(g).

[16]Contrary to Essex's claim, the adequacy of notice is not to be judged based solely on the four corners of the document. *Cf.* Pl.'s Brief at 9 (arguing that "[t]he sole issue to be determined . . . is whether the . . . Notice to Redeliver is *facially* adequate") (emphasis added); Tr. at 124-25 (Essex's counsel asserts that "you have to judge the adequacy of the notice [on] the four corners of the notice," and that "the notice has to stand on its own."). Instead, as Mullane notes, the determination should be made in the context of "all the circumstances" of the particular case at hand. *See* Mullane, 339 U.S. at 314. *See generally* Def.'s Brief at 17-18 (discussing cases where adequacy of notice was determined based on consideration of information and circumstances in addition to the content of the official notice document).

It is equally clear that the adequacy of notice is to be measured against an objective standard (except, of course, where actual notice is proven). Thus, neither party here disputes that the relevant standard is that of the "reasonable importer." *See*, *e.g.*, Pl.'s Reply Brief at 14, 15 (referring to, respectively, "[a] reasonable importer" and "a reasonable importer"); Def.'s Brief at 9, 11 (referring, in both instances, to "a reasonable importer").

Measured against that standard, the Amended Notice to Redeliver clearly passes muster. Based on the content of the Amended Notice itself, and particularly in light of the context surrounding that Notice, a reasonable importer would have had adequate notice of the basis for Customs' demand.

### 1.  The Content of the Amended Notice to Redeliver

In a phrase, Essex claims that the Amended Notice to Redeliver "[f]ailed to [s]tate the [r]easons for the [e]xclusion of [its] [g]oods."  Pl.'s Brief at 10.  Essex argues that an importer "cannot be required to guess" at the basis for Customs' actions.  Pl.'s Reply Brief at 8.  True enough. But, in this case, there was no need to guess.  A reasonable importer giving a fair reading to the Amended Notice – together with the Certificate of Origin and other entry papers filed by the importer – could not fail to grasp the basic thrust of Customs' concern: the merchandise's country of origin, and the potential for a transshipment violation.

On its face, the Amended Notice refers to, and thus incorporates, the entry documents, which (as Essex obviously knew) pertain to textiles said to have been manufactured in Mongolia.  In Block 9 of the Amended Notice, captioned "Statutes/Regulation(s) Violated," the box "Other, Namely" was checked and the words "Certificate of origin for Mongolia" were typed in.[17]  In Block 14, "Action

---

[17]Essex repeatedly complains that "no applicable regulations or statutes are cited" in the Amended Notice to Redeliver.  *See*, *e.g.*, Pl.'s Brief at 18.  Specifically, Essex criticizes the Notice for failing to make "reference to the laws or regulations which prescribe the determination of country of origin for textile and apparel articles (19 U.S.C. Section 3592; 19 C.F.R. Section 102.21), . . . [or] to . . . TBT 98-018."  Pl.'s Reply Brief at 1-2, 15.  According to Essex, if Customs had invoked those authorities, "then Essex might have been adequately apprised" of the basis for the demand for redelivery.  Pl.'s Reply Brief at 11-12.  *See also id.* at 19-20.

Required of Importer," another box was checked, with a notation that the subject goods were to be redelivered to Customs within 30 days. Finally, in Block 15, "Remarks/Instructions/Other Action Required of Importer," Customs noted: "Merchandise must be redelivered into Customs Custody. Per Mongolian Customs letter dated 9/22/00, 'No records are found that "Mongol Jindu" company cleared 43506 pieces of goods for export with the certificate of origin MNUS 1917 A0002400.[']"

Reading the Amended Notice (which indicated that Mongolian Customs could not verify the clearance for export of the goods in question under the Certificate of Origin submitted by Essex) in conjunction with the Certificate of Origin that Essex itself submitted (which appeared to indicate, by Mongolian Customs' stamps and other markings, that Mongol Jindu *had* cleared the goods with Mongolian Customs), it is apparent that U.S. Customs demanded redelivery because – according to Mongolian Customs – the goods in question in fact were never registered or cleared for export by the Mongolian authorities;[18] hence, the Certificate of Origin was invalid, and misrepresented the

---

Clearly, it would have been far preferable had the Amended Notice to Redeliver cited a specific law or regulation. But the issue presented is not whether Customs could have done better, but – rather – whether Customs did enough. Essex concedes, as it must, that Customs is not required to quote "chapter and verse" of the law or regulation allegedly violated. *See* Tr. at 12, 14-15 (counsel concedes that a narrative explanation of violation would satisfy constitutional requirements for notice). As discussed above, due process required only notice reasonably calculated, under all the circumstances, to apprise Essex of the basis for Customs' action.

[18]Essex attacks the U.S.-Mongolian arrangement concerning Certificates of Origin, asserting that it is unclear whether the arrangement is consistent with U.S. laws and regulations governing the determination of the country of origin of textile and apparel products. *See*, *e.g.*, Pl.'s Reply Brief at 2, 7-8, 10-11, 13, 18.

As the Government notes, however, nothing in the relevant statutes and regulations appears to bar or otherwise conflict with the U.S.-Mongolian arrangement. *See* Def.'s Reply Brief at 7-8. Certainly Essex has pointed to nothing. Indeed, as the Government observes, the arrangement relates not to the substantive rules of country of origin determinations but, rather, to the mechanics of how

country of origin of the merchandise at issue. As the Government put it, "since the word 'origin' *is*

included on the notice, i.e., 'Certificate of Origin,' *and* the reason given for redelivery is, in effect,

that the Mongolian government could not verify the certificate because no such goods were cleared

for export by Mongolian Customs, the only reasonable conclusion from this information, one that

both [Essex and Customs] understood, is that misrepresentation of the *country of origin* was at

issue."[19]  Def.'s Reply Br. at 3.

---

country of origin claims are to be verified. *See* Def.'s Reply Brief at 5-6; *see also id*. at 6 n.4 (emphasizing that the U.S.-Mongolia arrangement bears "only on the accuracy of claims that goods were wholly manufactured in Mongolia, and has nothing whatsoever to do with altering the principles for determining the country of origin"). Thus, "[i]f anything, the arrangement with Mongolia compliments [sic] [U.S. law], by preventing fraud." Def.'s Reply Brief at 7-8. *See also* n.4, *supra*.

In any event, and more to the point, like a number of Essex's other arguments, the gravamen of this argument – the validity of the U.S.-Mongolian arrangement – is irrelevant to the instant case, which concerns only the timeliness and adequacy of Customs' notice to Essex.

[19]As discussed in note 14 above, Essex has maintained that redelivery in this case was demanded under 19 C.F.R. § 113.62(d), rather than § 141.113(b) (the regulation on which the Government relies). For purposes of analyzing the adequacy of notice, it makes little difference.

As noted above, under § 113.62(d), redelivery can be required for three reasons: (1) because the merchandise does not comply with "the laws or regulations governing admission into the United States"; (2) because Customs needs to examine, inspect or appraise the merchandise; or (3) because the merchandise must be marked with the country of origin. 19 C.F.R. § 113.62(d) (2000). Essex has never asserted that it believed that Customs' demand for redelivery was based on an issue of examination or marking. Indeed, Essex has expressly disavowed such a belief. *See* Pl.'s Brief at 12 (emphasizing that the Amended Notice "did not allege any need to examine, inspect or appraise the imported jackets . . . . [n]or did Customs allege any defect in the country of origin marking"); Pl.'s Reply Brief at 10 (essentially the same).

By definition, if – as Essex asserts it believed – Customs' demand for redelivery was governed by § 113.62(d), and if – as Essex concedes – Essex knew that the demand for redelivery was not based on an issue of examination or marking, the demand could only have been based on a finding of a violation of "the laws or regulations governing admission into the United States."  19

Essex implies that it was misled by Customs' focus on the Certificate of Origin, and argues

that "an issue concerning *country of origin* is distinct from an issue regarding [a *Certificate of*

*Origin*]." Pl.'s Reply Brief at 15 (emphasis added). But that argument is strained, and artificially

dissociates the matter (*i.e.*, the Certificate of Origin) from its function (*i.e.*, documenting the country

of origin of imports).[20] As the Government queried: "What, in the mind of a reasonable importer,

would the Certificate of Origin be for, if not to confirm country of origin . . . ?" Defendant's Brief

at 16. Although he was repeatedly pressed in oral argument, counsel for Essex was at a loss to

answer that question. *See, e.g.*, Tr. at 29, 43 (counsel was asked "[W]hy would [Customs] be

concerned about the authenticity of the certificate [of origin] if they weren't concerned about the

underlying [fact of the country of origin]?", 117 (counsel was asked "What else could you possibly

---

C.F.R. § 113.62(d) (2000). And, as explained immediately above, the very face of the Amended
Notice to Redeliver would lead any reasonable importer, under the circumstances presented here,
to conclude that the violation at issue concerned the merchandise's country of origin.

[20]The Government is justifiably skeptical of Essex's claims that it believed Customs' concern
to be nothing more than a minor issue of "documentation." *See* Tr. at 130 (counsel for Essex states
that he "understood that [Customs'] problem was a documentation requirement").

As the Government notes, it strains credulity to contend that an importer would devote so
much time and energy over a matter of several months to a matter that they believed to be "legally
meaningless." *See* Tr. at 90 (counsel for Government argues that Essex "can't be saying that this
was legally meaningless . . . [T]hey were just doing all this stuff for two months, sending people over
[to Mongolia], and . . . it was legally meaningless."), 152-53 (counsel for Government notes that he
"just can't believe that two months' worth of discussions following this issuance of the [Amended
Notice], just was over some meaningless document. Everyone knew what was going on here."). *See
also* Tr. at 29, 30, 138 (counsel for Essex was asked whether Essex thought Customs wanted valid
Certificate of Origin "just . . . for their files," whether Customs was "just going through some formal
process," whether Customs' interest in valid Certificate of Origin was "just an empty formality," and
whether Customs "just wanted to check a little box on some form that said, 'Yep, we've got [a valid
Certificate of Origin.]' ").

have thought this [concern with the certificate of origin] meant?").[21]

In short, on the face of the document alone, the Amended Notice to Redeliver constituted

sufficient notice to a reasonable importer.[22]

---

[21]In its opening brief, the Government asserts that "nowhere . . . does Essex allege that it was misled by Customs into thinking that the Notice of Redelivery was issued for *another* reason (a reason *other* than that the country of origin had been misrepresented)." *See* Def.'s Brief at 15.  But, in its opening brief, Essex claims that "Customs repeatedly stated that the origin of the shipment has not been questioned." *See* Pl.'s Brief at 8.

At first blush, the difficulty of reconciling the quoted statements might appear to raise at least the spectre of a dispute of fact.  However, neither party's assertion is supported by a reference to the evidentiary record.  Thus, both statements may be dismissed as unsupported argument.  Moreover, even if the assertions were considered to raise a dispute of fact, neither party has argued that this – or any other difference – constitutes a *genuine* dispute of *material* fact sufficient to defeat summary judgment.  (To the contrary, both parties have affirmatively argued that the case is ripe for summary judgment.  *See* Pl.'s Brief at 9; Def.'s Brief at 11-12; Pl.'s Reply Brief at 6-7.)  In any event, the record is devoid of evidence on this point sufficient to enable Essex to survive a directed verdict.  Accordingly, under the standards articulated by the Supreme Court and discussed in section II above, a trial would be pointless, and summary judgment is appropriate.  *See* Anderson v. Liberty Lobby, 477 U.S. at 249-52.

[22]As the Government notes, it could also prevail in this action based on a theory of "mistake of law."  *See generally* Def.'s Brief at 18-19.  A mistake of law occurs where "the facts are known but their legal consequences are not known, or are believed to be different than they really are." Prosegur, Inc. v. United States, 25 CIT ____, ____, 140 F. Supp. 2d 1370, 1377 (2001) (citation omitted).  *See also* Executone Info. Sys. v. United States, 96 F.3d 1383, 1386 (Fed. Cir. 1996).

Applying that theory to the facts of this case, it is clear that – by the time the Amended Form 4647 Notice to Redeliver issued – Essex realized that Customs had rejected the Certificate of Origin as invalid.  In addition, Essex knew that the Amended Notice made no further mention of a sample (which is sometimes requested for examination for requisite marking of merchandise).  Essex is properly chargeable with knowledge of the legal effects of those facts.

The only statute or regulation which refers to both Form 4647 and the word "origin" in the context of textiles (other than the correct marking of them) is 19 C.F.R. § 141.113(b) – the regulation establishing an extended conditional release period of 180 days for the sole purpose of verifying the accuracy of *country of origin* claims.  Essex is thus chargeable with knowledge of the basis for Customs' demand for redelivery in this case.

### 2.  **The Context of the Amended Notice to Redeliver**

In addition to the content of the Amended Notice, the context surrounding its issuance also would have alerted a reasonable importer that the Certificate of Origin submitted to Customs misrepresented the country of origin.

Instructive here is Lord & Taylor v. United States, 26 CCPA 151 (1938), involving a challenge to the sufficiency of notice of a Tariff Commission investigation of "infants' wear."  The plaintiff in that case claimed that the agency's use of the term "infants' wear" failed to alert it that the investigation would also address clothing for children between two and six years of age.  The court held that notice, if sufficient "to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led"; thus, when "a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."  26 CCPA at 156-57 (citations omitted).

Assuming – for the sake of argument – that the Amended Notice, standing alone, was not sufficient to apprise a reasonable importer of the basis for the demand for redelivery, it nevertheless was certainly (in the parlance of Lord & Taylor) sufficient "to excite attention and put the [importer] on his guard and call for inquiry."  Yet Essex never inquired as to the basis for Customs' action; Essex never sought any sort of clarification.[23]  In these circumstances, because Essex clearly had

---

[23]In its briefs, Essex has sought to portray itself as utterly baffled by Customs' demand – "completely in the dark."  *See*, *e.g.*, Pl.'s Brief at 13.  But that picture is at odds with Essex's course of conduct, and the communications between the parties.  Conspicuously absent from the evidentiary record is any correspondence from Essex or its counsel questioning or seeking to clarify the basis for the demand for redelivery.  *See*, *e.g.*, Def.'s Brief at 15.  As the Government has observed, Essex showed no signs whatsoever of being perplexed.  *See* Def.'s Reply Brief at 3.

"sufficient information [from the Amended Notice] to lead [it]" to the basis for the demand for redelivery, Essex must "be deemed conversant" of the basis for the demand for redelivery. *See* Lord & Taylor, *supra*.

Indeed, in at least one communication with Essex's counsel, Customs *expressly* made the connection between the validity of the *Certificate* of Origin and the agency's underlying concern – *country* of origin. According to Essex's counsel, in a November 6, 2000 phone call, a Customs representative explained "that if the [Certificate of Origin] is false, then Customs becomes increasingly critical of *other* documents produced by the importer *for country of origin purposes*." Celis Aff. ¶ 13 (emphases added). That conversation should have left no room for doubt in the mind of a reasonable importer as to the basis for the demand for redelivery.

Essex's conduct and its correspondence with Customs indicate that it was in fact aware that the demand for redelivery concerned the country of origin of the merchandise at issue, and the absence of a Mongolian Customs' record of exportation. Not only did Essex understand the nature

---

Although he was repeatedly challenged in oral argument, counsel for Essex was at a loss to explain what Essex or its counsel (or any reasonable importer) might have believed to be the basis for the Amended Notice to Redeliver, if it was not country of origin concerns. *See*, *e.g.*, Tr. at 16-17 (counsel was asked "What is it that you thought the problem was? How were you or Essex misled?"), 19-20 (counsel was asked "What did you think was [Customs'] problem?"), 29-30 (counsel was asked "What did you think [Customs'] problem was?"), 116 (counsel was asked "What could you possibly have thought that [language in the Amended Notice to Redeliver] meant, other than that [Customs] had a problem with country of origin?"), 117-19 (counsel was asked "[W]hat could a reasonable importer have possibly thought?"), 121 (counsel was asked "What possibly could this [Amended Notice] otherwise have meant?"), 123 (counsel was asked "[I]f you didn't understand, if that wasn't adequate notice, . . . if you were confused, what did you think that it was? . . . What was the problem?"), 134 (counsel was asked "[I]f you didn't understand, or if a reasonable importer would have not understood from this [Amended Notice] that the problem was country of origin, what would a reasonable importer have believed to be the problem?"), 141 (counsel was asked "[W]hat did you believe to be the reason that [Customs was] requiring redelivery?").

of the problem; it struggled in vain for several months to "cure" it, by submitting documents purportedly from Mongolian authorities in an effort to substantiate the validity of the Certificate of Origin, and even dispatching representatives of the company to Ulaanbaatar.[24]   *See* Def.'s Brief at 16, 18; Celis Aff. ¶¶ 10, 11, 14; *id.*, Exhs. C, D.

Also very telling are the discussions that Essex initiated with Customs, exploring the possibility of submitting merchandise production records (such as invoices for raw materials, cutting tickets, sewing sheets, time cards, salary payment records, and shipping records).[25]   Because an

---

[24]Essex seeks to strike from the record as hearsay an exhibit attached to two declarations submitted by the Government.  *See* Pl.'s Reply Brief at 21-22.  The exhibit in question is an e-mail message sent to the U.S. Customs Attaché in Beijing by an official at the U.S. Embassy in Mongolia. The message recounts an exchange between that official and a Mongolian official in which the Mongolian official advised that the Certificate of Origin which Essex eventually presented to U.S. Customs had been previously issued in Mongolia to a company other than Mongol Jindu and had then been reported missing under suspicious circumstances.  *See* Thomas Decl. ¶ 13, Exh. F; Conley Decl. ¶ 41, Exh. 16.

Essex contends that the Government proffered the e-mail message "to prove the truth of the matter asserted, namely that the certificate of origin from Mongolia is false."  Pl.'s Reply Brief at 22.  To the contrary, the Government states that the message was submitted "not for the truth of the matters asserted, but to show what information was communicated to Customs officials and hence by those officials to plaintiff, in showing, *inter alia*, that Customs did not act arbitrarily or capriciously."  Def.'s Reply Brief at 11.  Because the e-mail message was not submitted to establish the truth of the matter asserted, it is not hearsay.  Essex's request to strike the evidence is therefore denied.

Indeed, whether or not the Certificate of Origin is in fact false is irrelevant to this action. That fact would go only to the correctness of Customs' determination that Essex misrepresented the country of origin of the merchandise – an issue that is distinct from the question of the timeliness and adequacy of notice, which are the issues presented here.

[25]Essex asserts that, despite its "repeated offers," Customs never accorded it the opportunity to submit production records in lieu of a valid certificate of origin.  Pl.'s Reply Brief at 12.  In contrast, Customs maintains that it raised the matter, but Essex chose not to provide the records.  *See* Thomas Decl. ¶¶ 14, 19; Conley Decl. ¶ 39.  Whether or not production records were in fact ever

importer submits production records as proof of country of origin, Essex's discussion of such records

in this case is probative of whether a reasonable importer in its shoes would have appreciated the

significance of Customs' challenge to the validity of its Certificate of Origin.  *See generally* Def.'s

Brief at 16-17; Def.'s Reply Brief at 4 (noting that Essex has characterized as "production records"

certain documents submitted with its October 17, 2000 letter, and posing the question "Why would

plaintiff volunteer what it considered as production records absent an understanding that the country

of origin . . . was at issue?").  Essex's discussions with Customs concerning production records thus

evidence its "state of mind" – its understanding of the relationship between, on the one hand,

Customs' interest in authenticating the Certificate of Origin and, on the other, the basis for Customs'

demand for redelivery (*i.e.*, the agency's determination that the Certificate of Origin was invalid and

that Essex had misrepresented the country of origin).

---

offered to Customs is not material here.  As discussed above, what *is* material, and highly probative, is that (by its own admission) Essex discussed providing such records to Customs – because the records would be relevant only to establishing country of origin.  In short, Essex's admission that it considered the possibility of submitting production records belies its claim that it did not know the true nature of Customs' concern.

As an aside, it is also worth noting that the evidentiary record does not bear out Essex's claim that it made "repeated offers" which Customs rebuffed.  The Government vehemently denies Essex's version of the facts on this point.  *See*, *e.g.*, Def.'s Brief at 16-17, 24.  And the only record evidence that even arguably lends support to Essex's assertions is the relatively conclusory statement in counsel's affirmation that "no opportunity was given for submission of documents verifying the country of origin . . . .  Plaintiff even provided documents showing country of origin [referring to the several documents included in the October 17, 2000 letter] . . ., which were eventually disregarded and dismissed by Customs."  Celis Aff. ¶ 19.  Conspicuously absent from the record is any contemporaneous correspondence from Essex to Customs offering true "production records."  *See* Tr. at 71-74, 86, 89, 112.  *See also* Tr. at 94-95 (Government counsel notes that documents provided with October 17, 2000 letter were "not even a drop in the bucket"), 108-09 (Government counsel notes that, unlike documents supplied by Essex to date, true production records would be difficult to forge).

But most telling of all is the October 17, 2000 letter from Essex's counsel to U.S. Customs (discussed in section III.A, above) – the proverbial "smoking gun" in this case. In that letter, Essex's counsel requested that Customs seek reverification of the Certificate of Origin. In addition, Essex's counsel asked that Customs defer any further action on the Notice to Redeliver pending a response from Mongolian authorities, observing that "ample time" then still remained on "the special conditional release period for textile and apparel articles." Celis Aff., Exh. B. The phrase "special conditional release period" can only be a reference to 19 C.F.R. § 141.113(b) – the regulation establishing an extended conditional release period for the sole purpose of verifying the accuracy of *country of origin* claims. *See* 59 Fed. Reg. 61,798 (Dec. 2, 1994). Essex's letter thus unequivocally evidences its awareness of the nature of Customs' underlying concern – the country of origin of the merchandise at issue.[26]

In sum, particularly when considered in the context of surrounding circumstances, the Amended Notice to Redeliver was sufficient to put a reasonable importer on notice of the basis for Customs' action in this case. Indeed, the Amended Notice was not only *objectively* sufficient; it was *subjectively* sufficient as well. Essex's course of conduct, and its communications with Customs, reveal that Essex in fact knew exactly what the problem was.

Yet this is no ringing endorsement of the Amended Notice. To hold that it was constitutionally adequate is to damn with faint praise indeed. It would have been a simple matter

---

[26]The October 17, 2000 letter is the "smoking gun" not only on the issue of the adequacy of the Amended Notice to Redeliver, but on the issue of its timeliness as well. Just as the letter's reference to "the special conditional release period" evidences Essex's awareness of Customs' concern with country of origin, so too it reflects Essex's awareness of the applicability of 19 C.F.R. § 141.113(b) and the 180-day conditional release period set forth there. *See* section III.A, *supra*.

to cite the relevant regulations on the face of the notice.  One hopes that this case is an aberration, and not the norm, and that Customs will exercise greater care in the future.  The international trade community has the right to expect more from the Government.

## IV.  <u>Conclusion</u>

At bottom, Essex candidly concedes that – in lieu of filing a protest to press "a technical argument directed only at knocking out this particular [r]edelivery [n]otice" – it would have readily honored Customs' demand for redelivery, if the merchandise at issue had still been in its custody. *See* Tr. at 36, 46, 61, 65-66.  But, Essex asserts, given the seasonal nature of the apparel market, it is impracticable to hold inventory for six or seven months. *See* Tr. at 51-54.  Essex maintains that it has done everything in its power to be responsive to Customs' concerns. *See* Pl.'s Brief at 18-19; Tr. at 23, 37.  Essex therefore concludes that, under the circumstances, it is unreasonable to subject it to a claim for liquidated damages running into the hundreds of thousands of dollars. *See* Tr. at 27, 36, 46, 149.

Yet even Essex admits that something in the underlying transaction was amiss. *See* Tr. at 135.  Essex may indeed be the unwitting victim of deceit perpetrated by others somewhere "upstream" in the supply chain.  But, in promulgating the applicable regulation (19 C.F.R. §141.113(b) ), Customs explicitly recognized that the commercial realities of the textile and apparel industries would mean that many importers would be forced to pay liquidated damages because the subject goods would no longer be available for redelivery.  Even more to the point, Customs foresaw that some innocent importers who had acted with reasonable care would nevertheless be held liable.

As Customs noted at the time, no finding of culpability is required under the regulation.   It is a strict liability, "no fault" provision.  *See* 59 Fed. Reg. 61,798 (Dec. 2, 1994).  Actual innocence is thus no defense.

For all the reasons set forth above, Customs properly denied Essex's protest, concluding that the Amended Notice to Redeliver was both timely and legally sufficient.  Plaintiff's Motion for Summary Judgment is therefore denied, and Defendant's Cross-Motion is granted.

Judgment will enter accordingly.

_____
Delissa A. Ridgway
Judge

Decided:   April 29, 2003
                 New York, New York